OPINION OF THE COURT
Ira B. Harkavy, J.
Defendant and third-party plaintiff 267 Canal Street Corp. moves, pursuant to CPLR 3212, for an order awarding it summary judgment dismissing plaintiffs Po W. Yuen, guardian of plaintiff Wing Cheong Woo (Mr. Woo), an incapacitated person, and Sau Fong Woo’s (Ms. Woo) complaint. Second third-party defendant J&J Super, Inc. (J&J) cross-moves for summary judgment dismissing third-party defendant/second third-party plaintiff GET Fashion, Inc.’s second third-party complaint against J&J. GET cross-moves for summary judgment dismissing 267’s third-party complaint.
Background Facts and Procedural History
On December 1, 2000, shortly after 12:00 noon, Mr. Woo was assaulted by second third-party defendant Eric McClendon on the sixth floor of the building located at 265-267 Canal Street in Manhattan (the building). At the time of the assault, Mr. Woo was the president and sole shareholder of GET and J&J, which were clothing manufacturing businesses that operated in the same space on the sixth floor of the building.[1] GET rented this space from the owner of the building, 267, pursuant to a written lease agreement that became effective on January 1, 2000.[2]
The building was a six-story commercial “garment factory” located in the Chinatown section of Manhattan. In fact, several different clothing manufacturing businesses, including GET, leased space and manufactured apparel in the building. During business hours (i.e., when the assault took place), the front door of the building, which led to the lobby, remained open. Inside the lobby there were two elevators, both of which accessed all six floors of the building. One of these elevators was used for *496 freight and was operated by two elevator operators. If the elevator operators did not recognize a person seeking to use the freight elevator, they would ask to see a receipt or bill before taking the person to the desired floor. The other elevator in the lobby, which was for passenger use, was not assigned an elevator operator. Instead, passengers merely pressed the button for the floor they wished to reach. However, each tenant in the building was given a key which they could use to prevent the passenger elevator from opening in their leased area. In addition to the two elevators, the building also had two stairways, one of which led to the area leased by GET on the sixth floor of the building. The street-level doors of these stairways were kept locked and tenants and their employees were provided with keys to open these doors.
The area of the sixth floor leased by GET consisted of an open area, where approximately 20 employees worked at sewing machines, and an enclosed office area where Mr. Woo worked. The freight elevator opened directly inside the leased area. However, in order to gain access to the leased area from the passenger elevator, one had to pass through a cage-like metal door that was supposed to be kept closed and locked at all times. This door could be opened with a key that was given to GBT’s employees, or it could be opened by pushing a “buzzer” button inside the leased area which released the lock on the doors. There was also a separate steel cage door which prevented persons in the stairwell from gaining access to the leased area unless they had a key or were “buzzed in” by a person inside the leased area.
According to McClendon’s affidavit and deposition testimony, on December 1, 2000, he entered the building through the open front door and proceeded to the passenger elevator in the lobby. McClendon testified that he intended to go through the building starting at the top floor and buy merchandise, which he would resell for a profit. Accordingly, McClendon entered the passenger elevator and pushed the button for the sixth floor. Although an operator for the freight elevator was in the lobby at the time, McClendon stated that the operator was too busy to notice Mc-Clendon. At the sixth floor, McClendon exited the elevator and proceeded to the steel cage door, which, according to McClendon’s testimony, was ajar. McClendon then walked into the leased area and entered the office, where he noticed a boy sitting on a couch with a cashbox in his lap. According to Mc-Clendon, although he was tempted to steal the cashbox, he *497 exited the office without taking anything. Upon leaving the office, Ms. Woo saw McClendon, screamed, and ran into the office. McClendon testified that he attempted to leave the leased area but Mr. Woo grabbed him. McClendon then struck Mr. Woo in the face with his fist. As a result, Mr. Woo fell, struck his head on the ground, and sustained a catastrophic brain injury. Thereafter, McClendon returned to the lobby using the passenger elevator and exited the building. Shortly after the attack, Eric Chong, the managing agent for the building at the time of the accident, inspected the steel cage door and discovered that if the door was opened a full 180 degrees, it would not fully close and lock as it was designed to do. According to Mr. Chong, GET employees were aware of this problem and it is undisputed that a sign was placed inside the leased premises which told employees (both in English and Chinese) to make sure that they fully closed the door when entering and leaving the leased premises.
Some three months later, McClendon was arrested while attempting to burglarize another garment factory building. Mc-Clendon eventually pleaded guilty to attempted assault in the first degree for his actions on December 1, 2000, and was sentenced as a persistent violent felony offender to 16 years to life in prison. At the time of his sentencing, McClendon attempted to retract his guilty plea but this application was rejected by the sentencing court. On October 22, 2002, McClendon’s conviction was affirmed by the Appellate Division, First Department (People v McClendon, 298 AD2d 252 [2002]).
By summons and complaint dated May 31, 2002, plaintiffs brought the instant action against 267 alleging that it negligently failed to provide adequate security at the building. In addition, Ms. Woo asserted a derivative claim against 267. Thereafter, 267 brought a third-party action against GET seeking common-law contribution/indemnification and contractual indemnification. GET subsequently brought a second third-party action against McClendon, J&J, and J&L Sportswear Co. seeking common-law contribution/indemnification.
Plaintiffs’ Claims against 267
267 now moves for summary judgment dismissing plaintiffs’ claims against it. In so moving, 267 argues that the criminal assault upon Mr. Woo was an unforeseeable act given the lack of any similar incidents preceding the attack. Under the circumstances, 267 maintains that the security measures in the building—including the steel cage doors protecting the area leased by *498 GET, the screening of delivery personnel by the freight elevator operators, the locked doors to the stairwells, and the ability to lock out the passenger elevator from specific floors—were adequate as a matter of law, thereby precluding any finding of liability against 267.
In support of this argument, 267 points to the deposition testimony of the building’s current and former managing agents. In particular, Shun K. Fung, the managing agent for the building between 1985 and August 2000, testified that he was unaware of any mugging incidents or assaults occurring in the building during his tenure and he never received any complaints from tenants about inadequate security in the building. Similarly, Mr. Chong, the managing agent for the building from August 2000 to the present, testified that, before the attack on Mr. Woo, he was unaware of any prior robberies or assaults taking place in the building and he never received any complaints from GET regarding unauthorized persons gaining access to the leased area.
In addition to the building’s managing agents, 267 points to the testimony of Peter Wong, the president of another garment manufacturing company which also leased space on the sixth floor of the building. According to Mr. Wong, the steel cage doors such as those present in the building were customary in the garment industry in Chinatown. Mr. Wong also testified that he was unaware of any violent crimes taking place in the building prior to the assault upon Mr. Woo and he characterized security in the building as “fairly safe.”
267 also points to the affidavit and deposition of McClendon. In particular, 267 notes the fact that McClendon testified that the steel cage door leading to the leased area was ajar when he exited the passenger elevator. Thus, 267 reasons that the assault upon Mr. Woo was not caused by a lack of adequate security features in the building, but, rather, was caused by the failure of one of GBT’s employees to close this door behind them when he or she entered or exited the leased premises. Finally, to the extent that the door was not functioning properly, 267 argues that it did not have notice of any problems with the door and that under the terms of the lease agreement, GET was responsible for maintaining the door.
In opposition to 267’s motion, plaintiffs argue that 267 has failed to establish that it met its duty of providing adequate security at the building. In support of this argument, plaintiffs point out that, prior to the assault, the building had a serious *499 problem whereby vagrants and homeless people gained access to the building’s stairwells where they slept during the winter months. Plaintiffs also point out that Ms. Woo testified that, two or three months prior to the underlying assault, she discovered an intruder in the office who fled when she saw him. In addition, plaintiffs have submitted a New York City Police Department (NYPD) “complaint address tracking system” sheet for the building’s address which indicates that robberies took place there in March and May 2000, and a burglary occurred there in February 2000. Plaintiffs have also submitted a 1997 NYPD “compstat” sheet for the precinct in which the building is located which indicates that there were 352 robberies, 227 felony assaults, 394 burglaries, 965 grand larcenies, 159 aggravated grand larcenies, 6 rapes, and 4 murders in the precinct during the subject year. According to plaintiffs, this indicates that the building was located in a high crime area.
Given this evidence of crime in and around the building, as well as the history of intruders gaining access to the building, plaintiffs maintain that the security measures in the building were clearly inadequate. In support of this claim, plaintiffs have submitted an expert affidavit by Leslie N.A. Cole, a professional security consultant. According to Mr. Cole, adequate security at the building would have consisted of a closed-circuit television system in the building to monitor activity, as well as appropriate signs notifying persons in the building that the premises were being monitored on closed-circuit television. Mr. Cole further maintains that an elevator operator and/or security guard should have been placed in the lobby of the building to control access to the passenger elevator. In addition, Mr. Cole argues that the front door of the building should have been kept locked. Finally, Mr. Cole claims that, as the owner of the building, 267 had a responsibility to ensure that the steel cage door leading to the leased premises on the sixth floor of the building functioned properly by automatically closing and locking after a person passed through the door.
“Landlords have a ‘common-law duty to take minimal precautions to protect tenants from foreseeable harm,’ including a third party’s foreseeable . . . conduct” (Burgos v Aqueduct Realty Corp., 92 NY2d 544, 548 [1998], quoting Jacqueline S. v City of New York, 81 NY2d 288, 293-294 [1993]). “[Foreseeability and duty are not identical concepts. Foreseeability merely determines the scope of the duty once the duty is determined to exist” (Maheshwari v City of New York, 2 NY3d 288, 294 [2004]). *500 “In order to establish the element of foreseeability, [a plaintiff is] required to present proof that the criminal conduct at issue was ‘reasonably predictable based on the prior occurrence of the same or similar criminal activity at a location sufficiently proximate to the subject location’ ” (Johnson v City of New York, 7 AD3d 577, 577-578 [2004], quoting Novikova v Green-briar Owners Corp., 258 AD2d 149, 153 [1999]). Thus, evidence of dissimilar criminal activity is insufficient to establish foreseeability. For example, evidence of prior shoplifting incidents at a shopping mall does not render a subsequent assault at the premises foreseeable (Durham v Beaufort, 300 AD2d 435, 436 [2002]). Similarly, evidence of vagrants being removed from a hotel lobby and of automobile break-ins occurring in a hotel parking lot do not establish that an assault that took place on the sixth floor of the hotel was foreseeable (Pascarelli v LaGuardia Elmhurst Hotel Corp., 294 AD2d 343, 344 [2002]). Moreover, “ambient neighborhood crime alone is insufficient to establish foreseeability” (<Johnson at 578).
Here, 267 has presented sufficient evidence in the form of Mr. Fung, Mr. Chong, and Mr. Wong’s deposition testimony to establish that, prior to the assault on Mr. Woo, there was no similar criminal activity on the sixth floor of the building, or in any of the other garment manufacturing businesses on the upper floors of the building. Accordingly, 267 has met its initial burden of demonstrating that it provided adequate security in the building given the unforeseeable nature of the assault. Under the circumstances, the burden shifts to plaintiffs to submit sufficient evidence to raise a triable issue of fact in this regard.
Plaintiffs have not met this burden. With regard to the issue of foreseeability, the overall crime statistics for the precinct in which the building is located are insufficient to demonstrate that an assault on the sixth floor of the building was foreseeable (Johnson, 7 AD3d at 578). Furthermore, the fact that vagrants managed to gain entry to the stairwells in the building prior to the incident does not support plaintiffs’ claim that the assault on Mr. Woo was foreseeable (Pascarelli, 294 AD2d at 344). There is no evidence that these vagrants ever threatened tenants or their employees, and, in any event, McClendon did not use the stairs to gain access to the area leased by GET. The NYPD complaint address tracking sheet submitted by plaintiffs is also insufficient to establish that the underlying assault was foreseeable since this report does not indicate whether the listed crimes took place inside or outside the building. At the same time, Ms. *501 Woo’s testimony that she discovered an intruder in the office several months before the assault is insufficient to establish foreseeability since there is no admissible evidence that 267 was notified of this incident. Ms. Woo admitted that she did not report this event to the police and her testimony that she told her husband what happened, and he in turn informed 267 of the event, is inadmissible hearsay.
Given the lack of prior similar criminal acts in the building, plaintiffs’ expert’s claim that 267 had a duty to provide enhanced security in the form of a closed-circuit television system, the posting of a security guard and/or additional elevator operator to screen persons entering the passenger elevator, and to lock the front door of the building during business hours is without merit. An after-the-fact realization that one or more of these measures might have prevented the tragedy that ultimately occurred does not establish that 267 breached its duty to provide minimal security precautions. 267 merely owed Mr. Woo a duty to adopt adequate security measures given the foreseeable risks, it was not an insurer of his safety (Maheshwari, 2 NY3d at 294). Finally, the fact that the steel cage door separating the leased premises from the passenger elevator did not always close automatically is insufficient to raise an issue of fact regarding 267’s negligence. It is undisputed that GET was responsible for maintaining this door under the terms of the lease agreement. Moreover, 267 did not have notice of this problem prior to the assault (St. Fleur v 2902 Cortleyou Ltd. Liab. Co., 300 AD2d 389 [2002]).
Accordingly, 267’s motion for summary judgment dismissing plaintiffs’ complaint is granted.
GBT’s Cross Motion for Summary Judgment
GET cross-moves for summary judgment dismissing 267’s third-party action. Given the dismissal of plaintiffs’ complaint against 267, the third-party action and GBT’s cross motion have largely been rendered moot. However, the third-party actian is still relevant to the extent that 267 seeks to collect the costs and attorney’s fees it incurred in defending itself in the first-party action.
Under paragraph 47 of the lease agreement, GET agreed to indemnify 267 for all damages and expenses, including attorney’s fees, which arose out of “violation of any agreement or condition of this Lease.” There is evidence before the court which indicates that GET was responsible for maintaining the *502 steel cage door through which McClendon gained access to the area leased by GET. There is also evidence that the failure of this door to automatically close was a contributing factor to the attack. Under the circumstances, 267 has a viable claim for costs and attorney’s fees against GET. Accordingly, GBT’s cross motion for summary judgment dismissing 267’s third-party action is denied.
J&J’s Cross Motion for Summary Judgment
In light of the dismissal of the first-party action, GBT’s claims against J&J in the second third-party complaint are moot. In any event, there is no evidence that J&J was in any way responsible for the attack upon Mr. Woo. Accordingly, J&J is entitled to summary judgment dismissing GBT’s claims against it.
Summary
In summary, 267’s motion for summary judgment dismissing plaintiffs’ complaint is granted. GBT’s cross motion for summary judgment dismissing 267’s third-party complaint is denied. J&J’s cross motion for summary judgment dismissing GBT’s claims against it in the second third-party complaint is granted.

. One of these companies performed union work, while the other performed nonunion work.

. At the time GET entered into the lease agreement, the building was owned by nonparty A-Chau Realty Corp. On or about August 28, 2000, A-Chau sold the building to 267.